**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

COREY J. McCORD, Esq., Personal Representative
of the Estate of Phillip L. Dawson, Jr., Deceased,

      Plaintiff,

v.

COLUMBIA CHARTER TOWNSHIP,
JACOB MILLS, and SPENCER BENNETT,

      Defendants.

**COMPLAINT**

Case No. _____

Hon. _____

**Jury Trial Demanded Pursuant to**
**Fed. R. Civ. P. 38(b)**

---

NOW COMES Corey J. McCord, Esq., Personal Representative for the Estate of Phillip L. Dawson, Jr., Deceased, by and through his attorneys, Bruce A. Inosencio, Jr., and Kristina M. Fisk of Inosencio & Fisk, PLLC, and for his *Complaint*, states and alleges as follows:

**INTRODUCTION AND NATURE OF THE ACTION**

1. This lawsuit arises from the arrest of Phillip L. Dawson, Jr., on May 13, 2023. What began as an arrest for a non-violent driving-related offense ended in Mr. Dawson's death. During his arrest, Mr. Dawson was restrained in a prone position — face down on concrete, with his hands cuffed behind his back — and kept there by Officer Jacob Mills and Officer Spencer Bennett even after Mr. Dawson was restrained. During the restraint, Mr. Dawson repeatedly gasped, "I can't breathe." In that position, stopped breathing, turned bluish purple, and lost consciousness. Mr. Dawson was transported by ambulance to Henry Ford Hospital in Jackson, where doctors diagnosed an anoxic brain injury — catastrophic brain damage caused by a lack of oxygen. On May 18, 2023, Mr. Dawson died within minutes of being removed from life support.

1

**JURISDICTION AND VENUE**

2.      This is a civil rights action for money damages arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983. Plaintiff seeks relief for the violation of rights provided by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and the laws of the State of Michigan against (a) Defendant Jacob Mills ("Officer Mills") and Defendant Spencer Bennett ("Officer Bennett") — in their respective capacities as law enforcement officers employed by the Columbia Township Police Department — for their respective violations of Mr. Dawson's right to be free from the use of excessive force; and (b) Defendant Columbia Charter Township ("Columbia Township") for its unconstitutional policies, customs, and/or practices under *Monell* and its progeny.

3.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 1983 and 1988.

4.      28 U.S.C. § 1331 gives this Court jurisdiction over cases arising under the Constitution or laws of the United States.

5.      28 U.S.C. § 1343 grants this Court jurisdiction over lawsuits seeking redress for the deprivation of constitutional rights under color of state law.

6.      42 U.S.C. § 1983 is the applicable federal statute under which claims of excessive force are brought against local township law enforcement officers.

7.      42 U.S.C. § 1988 authorizes the application of state law when federal law is deficient, and allows for attorney fees for prevailing parties in § 1983 actions.

8. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to these claims occurred in this district, all of the Defendants reside in the State of Michigan, and at least one of the Defendants reside in this district.

**PARTIES**

10. Plaintiff Corey J. McCord, Esq., is the duly appointed Personal Representative of the Estate of Phillip L. Dawson, Jr., Deceased, and brings this action in that capacity.

11. Decedent Phillip L. Dawson, Jr. was, at all relevant times, a resident of the State of Michigan.

12. Defendant Columbia Charter Township ("Columbia Township") is a Michigan municipal entity that operates the Columbia Township Police Department and is responsible for the policies, practices, training, supervision, and customs of that department.

13. Defendant Jacob Mills ("Officer Mills") was, at all relevant times, a police officer employed by, or acting on behalf of, Columbia Township and acting under color of state law.

14. Defendant Spencer Bennett ("Officer Bennett") was, at all relevant times, a reserve police officer employed by, or acting on behalf of, Columbia Township and acting under color of state law.

15. At all relevant times, Defendants Mills and Bennett were acting within the course and scope of their duties and under color of state law.

3

## FACTUAL ALLEGATIONS

16.     During the evening of May 13, 2023, Defendants Mills and Bennett were in a Columbia Township Police Department patrol car, parked just south of Lakeview Drive, between Almeda Ct. and Russell Ct.

17.     The location of the parked Columbia Township Police Department patrol car was hidden from view for any vehicle traveling eastbound on Lakeview Drive from Shady Lane toward Ocean Beach Rd.

18.     On May 13, 2023, Officer Mills and Officer Bennett — both of whom were involved in arresting Mr. Dawson at his home the night before — knew Mr. Dawson lived at the end of Shady Lane.

19.     On May 13, 2023, Officer Mills and Officer Bennett also knew that if Mr. Dawson were to attempt to drive out of his neighborhood, he would have to drive past the location where they were waiting in the Columbia Township Police Department patrol car.

20.     At approximately 8:55 p.m. on May 13, 2023, Mr. Dawson — who was driving on a suspended or revoked driver's license — left his home and drove his vehicle eastbound on Lakeview Drive.

21.     As Mr. Dawson drove past the Columbia Township Police Department patrol car and the officers waiting inside, Officer Mills and Officer Bennett, Mr. Dawson saw the officers and turned left onto a dead-end street, Russell Ct.

22.     Mr. Dawson stopped his car in the driveway area of 2936 Russell Court and exited his vehicle; Officer Mills and Officer Bennett pulled in behind him within seconds.

4

23.     As Officer Mills exited the patrol car, he activated the patrol car's overhead lights. At no time during the encounter did he activate the patrol car's siren.

24.     The encounter arose out of a traffic stop and arrest attempt by Columbia Township Officers Mills and Bennett. At 8:55:53 p.m., Officer Mills said to Mr. Dawson, "You're under arrest."

25.     During the encounter, Officer Mills and Officer Bennett physically seized Mr. Dawson, took him to the ground, and handcuffed him behind his back.

26.     Both officers' body cameras fell off during the attempt to handcuff Mr. Dawson and continued to record primarily audio during the critical restraint period.

27.     The Columbia Township Police Department patrol car's in-car camera system was inoperable and did not record the traffic stop or the arrest.

28.     During the restraint, Mr. Dawson repeatedly pleaded with the officers, including asking to go home, begging them to stop, and saying "I can't breathe" for the first time at 8:59:42 p.m. and saying "I can't breathe" again at 9:00:36 p.m.

29.     At 9:00:41 p.m., an eyewitness yelled to Officer Mills and Officer Bennett, "Dude, he's restrained. Stop!"

30.     At 9:00:52 p.m., Officer Mills contacted Jackson County Central Dispatch and said, "One in custody, we're OK."

31.     At 9:00:52 p.m., Officer Mills and Officer Bennett had Mr. Dawson in their custody.

32.     At 9:00:52 p.m., Officer Mills and Officer Bennett became responsible for Mr. Dawson's safety.

5

33. At 9:00:52 p.m., Officer Mills and Officer Bennett left Mr. Dawson face down on the concrete, with his hands behind his back, even though he was restrained and prevented no threat.

34. At 9:02:45 p.m., Officer Mills and Officer Bennett continued to choose to leave Mr. Dawson face down on the concrete, with his hands cuffed behind his back, even though he was motionless and showed signs of medical distress.

35. At 9:02:50 p.m.,  a male eyewitness yelled to the officers, "Dude is he alright?"

36. At 9:02:51 p.m.,  Officer Mills responded, "He's fine."

37. At 9:02:54 p.m., a male eyewitness and a female eyewitness both yelled to the officers, "Roll him over!"

38. At 9:03:00 p.m., Officer Mills yelled, "He's OK, back off!"

39. At 9:03:26 p.m., while Mr. Dawson was still face down on the concrete with his hands cuffed behind his back, Officer Mills told Mr. Dawson — twice — to stand up. Mr. Dawson did not respond. Officer Mills and Officer Bennett then attempted to pick Mr. Dawson up off the ground. In the process, at 9:03:31 p.m., Officer Mills tells Mr. Dawson, "stand up," but Mr. Dawson is not responsive and his legs are lifeless.

40. At 9:03:37 p.m., as Officer Mills and Officer Bennett realized Mr. Dawson was unable to stand, they did not remove his handcuffs and place him on his back, sit him up, or put him in the recovery position. Instead, they chose to keep Mr. Dawson handcuffed and dragged him about 15 feet south of where he had been lying face down, positioning him on the west side of their patrol car so he was no longer in view of the eyewitnesses across the street.

41.     As Officer Mills and Officer Bennett dragged Mr. Dawson's lifeless body to a position where they thought he could no longer be seen by eyewitnesses, one of the officers kicked Mr. Dawson as his legs dragged on the concrete and his head hung forward toward his chest.

42.     At 9:03:47 p.m., Officer Mills and Officer Bennett finally made the decision to place Mr. Dawson on his back.

43.     At approximately the same time as Officer Mills and Officer Bennett turned Mr. Dawson onto his back, the male eyewitness said, "he's dead" and the female eyewitness yells to the police, "we watched this!" The male eyewitness then says "oh my God."

44.     At 9:04:03 p.m., Officer Mills contacted Jackson County Central Dispatch and said, "Columbia 3. Need an ambulance, priority. Subject is going blue. Not breathing."

45.     At 9:04:46 p.m., Officer Mills again contacted Jackson County Central Dispatch and said, "[Columbia] 3. Be advised, he's got a pulse. He's breathing really shallowly."

46.     At 9:07:54 p.m., Jackson County Central Dispatch informed Officer Mills and Officer Bennett, "Columbia 3, rescue is 5 minutes out and JCA [Jackson Community Ambulance] is 7 minutes out."

47.     At 9:11:37 p.m., Officer Mills contacted Jackson County Central Dispatch and said, "Columbia 3, starting CPR," and Officer Bennett began chest compressions without rescue breaths.

48.     Officer Bennett continued chest compressions without rescue breaths until the ambulance arrived approximately one minute after he started chest compressions.

49.     Mr. Dawson was not breathing and did not have a pulse at the time the ambulance arrived.

50.     During the period of prone restraint, Mr. Dawson's condition progressed from him begging the officers to stop, to quieter distress, to growling and gurgling, to agonal breathing sounds, and then to limpness and unresponsiveness.

51.     After Mr. Dawson was in custody, Officer Mills and Officer Bennett were responsible for his safety until the ambulance arrived.

52.     Officer Mills and Officer Bennett failed to turn Mr. Dawson over onto his back, or sit him up, or put him in the "recovery position" immediately after he was restrained and in their custody.

53.     Officer Mills and Officer Bennett did not start CPR when they first recognized Mr. Dawson was experiencing a medical emergency. Instead, Officer Mills started saying — repeatedly — "stay with me. P.J." and "wake up, P.J."

54.     Mr. Dawson was transported by ambulance to Henry Ford Health, in Jackson, where he remained hospitalized in a coma until life support was withdrawn and he was pronounced deceased on May 18, 2023.

55.     Officer Bennett worked as an officer or in a reserve officer capacity for Columbia Township Police Department for only about three days at the time of Mr. Dawson's arrest on May 13, 2023.

56.     On May 13, 2023, Officer Bennett did not have his own assigned body camera and instead was wearing Chief Jay Niles' body camera because the system had not yet been modified to accommodate Officer Bennett's participation.

57.     Columbia Township maintained a written Use of Force policy effective January 1, 2021, which stated, among other things, that officers were to use objective reasonableness, use the minimum amount of force necessary, attempt de-escalation when possible, consider the totality of the circumstances including ground position, and arrange appropriate medical care when injury or the need for treatment was apparent or requested.

58.     Columbia Township also maintained a Reserve Unit policy, effective March 9, 2009, requiring reserve officers to at all times adhere to departmental policies, procedures, orders, and memorandums and to complete required training, including defensive tactics, first aid, CPR, AED, and all additional mandated training.

59.     Despite those written requirements, Officer Mills and Officer Bennett chose to leave Mr. Dawson restrained in the prone position — face down on concrete while his hands were cuffed behind his back — while his condition visibly deteriorated.

60.     Despite the obvious signs of medical distress, Officer Mills and Officer Bennett failed to timely reposition Mr. Dawson, failed to timely transition from force to rescue, and failed to timely begin appropriate lifesaving measures.

61.     As a direct and proximate result of the acts and omissions described above, Mr. Dawson suffered respiratory compromise, oxygen deprivation, anoxic and/or hypoxic brain injury, cardiac arrest, conscious pain and suffering, terror, and death.

## COUNT I

**42 U.S.C. § 1983 — EXCESSIVE FORCE, FAILURE TO INTERVENE, AND DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS AGAINST DEFENDANT JACOB MILLS AND DEFENDANT SPENCER BENNETT**

62.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

63.     At all relevant times, Officer Mills and Officer Bennett were acting under color of state law as law enforcement officers and/or agents of Columbia Township.

64.     The Fourth Amendment protects individuals from unreasonable seizures and from the use of objectively unreasonable force by law enforcement officers.

65.     The Fourteenth Amendment protects arrestees and pretrial detainees from deliberate indifference to serious medical needs and from the denial of timely and necessary medical care.

66.     At the time Officer Mills and Officer Bennett used force against Mr. Dawson, the force they employed was objectively unreasonable under the circumstances.

67.     Any legitimate law enforcement need to gain initial control of Mr. Dawson did not justify maintaining him in a prone, handcuffed position while his distress escalated and his ability to resist materially diminished or ceased.

68.     Once Dawson was on the ground, handcuffed, saying or attempting to say that he could not breathe, and/or showing obvious signs of respiratory compromise, a reasonable officer would have known that continued prone restraint and/or pressure on his upper body created a substantial and unjustifiable risk of serious injury or death.

10

69.     Officer Mills and Officer Bennett nevertheless continued to restrain Mr. Dawson in a manner that was objectively unreasonable, excessive, and dangerous, including by maintaining him prone after control had been achieved or after resistance had materially diminished.

70.     To the extent either officer placed body weight or pressure on Mr. Dawson's upper back, shoulder blade, or neck area during the restraint, that force was objectively unreasonable under the circumstances and contributed to Mr. Dawson's respiratory compromise and collapse.

71.     Mr. Dawson posed no immediate threat justifying prolonged prone restraint after he was handcuffed and his movements diminished.

72.     The force used against Mr. Dawson was greater than reasonably necessary to effectuate the arrest and was constitutionally excessive.

73.     Officer Mills and Officer Bennett each had a realistic and reasonable opportunity to prevent the constitutional violations committed by the other.

74.     Officer Mills observed Officer Bennett's conduct and had the opportunity to stop or reduce unconstitutional force and to promptly reposition Mr. Dawson.

75.     Officer Bennett observed Officer Mills' conduct and had the opportunity to stop or reduce unconstitutional force and to promptly reposition Mr. Dawson.

76.     Officer Mills and Officer Bennett knew, or should have known, that Mr. Dawson was in visible distress and continued prone restraint created a serious risk of grave harm.

77.     Despite having the opportunity and duty to do so, neither Officer Mills nor Officer Bennett intervened in time to prevent the continued unreasonable restraint, the delayed repositioning, or the delayed rescue response.

78.     During the restraint and immediately thereafter, Mr. Dawson had an objectively serious medical need.

79.     That serious medical need was obvious from his statements, his respiratory distress, his gurgling and snoring respirations, his agonal breathing, his change in movement, his limpness, his bluish / purple skin color, and his lack of responsiveness.

80.     Officer Mills and Officer Bennett each knew of facts from which the inference could be drawn that Mr. Dawson faced a substantial risk of serious harm.

81.     Officer Mills and Officer Bennett each drew that inference, or at a minimum recklessly disregarded an obvious risk that any reasonable officer would have recognized.

82.     Despite this known and obvious risk, Officer Mills and Officer Bennett failed to take reasonable measures to abate the danger.

83.     Among other things, Officer Mills and Officer Bennett failed to promptly reposition Mr. Dawson off his stomach, failed to promptly transition from force to rescue, failed to immediately provide appropriate emergency intervention once Mr. Dawson became bluish purple, limp, and unresponsive, and failed to timely begin lifesaving measures.

84.     The conduct of Officer Mills and Officer Bennett constituted deliberate indifference and/or objective unreasonableness toward Mr. Dawson's serious medical needs while he was in their custody.

12

85. As a direct and proximate result of the acts and omissions of Officer Mills and Officer Bennett, Mr. Dawson suffered respiratory compromise, oxygen deprivation, anoxic and/ or hypoxic brain injury, cardiac arrest, conscious pain and suffering, terror, and death.

86. By the acts and omissions described above, Officer Mills and Officer Bennett violated Mr. Dawson's rights established under the Fourth and Fourteenth Amendments to the United States Constitution, including: (a) the right to be free from objectively unreasonable and excessive force during seizure and arrest; (b) the right to be free from continued dangerous restraint after the need for such force had diminished; (c) the right to timely intervention by officers who witness unconstitutional force; and (d) the right to reasonable and timely medical care and protection from deliberate indifference to serious medical needs while in custody.

87. The rights violated by Officer Mills and Officer Bennett were clearly established at the time of the incident, such that a reasonable officer would have understood that maintaining a handcuffed person prone while he said he could not breathe and displayed obvious respiratory distress was unlawful.

88. The rights violated by Officer Mills and Officer Bennett were clearly established at the time of the incident, such that a reasonable officer would have understood that failing to promptly intervene, reposition, and render timely aid under those circumstances was unlawful.

89. Before losing consciousness, Mr. Dawson experienced conscious pain and suffering, fear, terror, physical distress, and the panic associated with the awareness of his inability to breathe.

90. Mr. Dawson thereafter suffered catastrophic bodily injury, including oxygen deprivation and an anoxic brain injury, ultimately resulting in his death.

## COUNT II

**42 U.S.C. § 1983 — MUNICIPAL LIABILITY (MONELL) AGAINST DEFENDANT COLUMBIA CHARTER TOWNSHIP**

91.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

92.     At all relevant times, Columbia Township, acting through the Columbia Township Police Department, was a municipal entity and a "person" within the meaning of 42 U.S.C. § 1983.

93.     At all relevant times, Columbia Township, through its policymakers, supervisors, customs, practices, and official decisions, was responsible for establishing, implementing, training on, supervising, and enforcing policies governing arrests, use of force, de-escalation, ground restraint, medical response, reserve-officer deployment, and body-worn camera usage.

94.     The constitutional injuries and death suffered by Mr. Dawson were directly and proximately caused by Columbia Township's policies, customs, practices, failures to train, failures to supervise, failures to equip, failures to discipline, and/or ratification of unconstitutional conduct.

95.     Columbia Township had, maintained, enforced, tolerated, or ratified customs, practices, and usages under which officers used force during ground restraints in a manner that unreasonably endangered restrained persons, including maintaining prone restraint after gaining control or after resistance diminished.

14

96.     Columbia Township had, maintained, enforced, tolerated, or ratified customs, practices, and usages under which officers failed to promptly reposition handcuffed subjects off their stomachs despite obvious risk factors and signs of respiratory distress.

97.     Columbia Township had, maintained, enforced, tolerated, or ratified customs, practices, and usages under which officers were not adequately directed, supervised, or corrected regarding the danger of compression or positional asphyxia during prone restraint.

98.     Columbia Township had, maintained, enforced, tolerated, or ratified customs, practices, and usages under which officers failed to timely intervene when a restrained subject said he could not breathe, made gurgling or snoring respirations, turned blue, became limp, or otherwise showed obvious signs of medical crisis.

99.     Columbia Township had, maintained, enforced, tolerated, or ratified customs, practices, and usages under which reserve officers were placed into patrol functions without adequate operational readiness, field integration, supervision, or enforcement of policy compliance.

100.    Columbia Township had, maintained, enforced, tolerated, or ratified customs, practices, and usages under which body-camera and vehicle-camera accountability failures were tolerated, including deploying a reserve officer without his own assigned/configured body camera and operating a patrol vehicle with an inoperable in-car camera.

101.    The need to train officers on the dangers of prone restraint, post-handcuff positioning, respiratory compromise, and positional/compression asphyxia was obvious.

102.    The need to train officers to recognize and respond immediately to a restrained subject saying "I can't breathe," making gurgling or snoring respirations, becoming cyanotic, becoming limp, or ceasing meaningful movement was likewise obvious.

103.    The need to train officers to reduce force and de-escalate once a subject's resistance lessens or ends was also obvious.

104.    The need to train reserve officers before patrol deployment, and to ensure they could competently apply policy in real-world arrest situations, was obvious.

105.    Despite these obvious needs, Columbia Township failed to adequately train Officer Mills, Officer Bennett, and other officers concerning: (a) prone restraint and the dangers associated with prolonged prone positioning; (b) compression and positional asphyxia; (c) the significance of a handcuffed subject stating he cannot breathe; (d) the significance of gurgling, snoring respirations, cyanosis, loss of muscle tone, and cessation of movement; (e) prompt repositioning of a restrained subject off his stomach; (f) reduction of force after gaining control; (g) timely medical intervention and transition from force to rescue; and (h) the safe field deployment and supervision of newly assigned reserve officers.

106.    Columbia Township's failure to adequately train its officers and reserve officers amounted to deliberate indifference to the constitutional rights and bodily safety of persons with whom those officers would come into contact.

107.    Columbia Township knew, or should have known, that without such training, officers confronting a prone, handcuffed, distressed subject would predictably violate constitutional rights through unreasonable force and deliberate indifference to serious medical needs.

16

108. Columbia Township failed to adequately supervise Officer Mills and Officer Bennett in connection with the arrest, restraint, and medical emergency involving Mr. Dawson.

109. Columbia Township failed to ensure that Officer Bennett was fully field-ready before assigning him to patrol duties.

110. Columbia Township failed to ensure Officer Bennett had his own assigned and configured body-worn camera before putting him into the field.

111. Columbia Township failed to ensure that the patrol vehicle used on May 13, 2023, had an operable in-car camera system.

112. Columbia Township failed to adequately enforce its own written policy requirements concerning minimum force, de-escalation, ground position, and medical response.

113. Columbia Township failed to discipline, retrain, or otherwise meaningfully correct unconstitutional practices relating to prone restraint, post-handcuff positioning, or reserve-officer patrol deployment.

114. These failures were not isolated acts of negligence. They reflected deliberate indifference by Columbia Township and/or its final policymakers to the known and obvious risk that restrained persons would suffer serious injury or death.

115. In the alternative, to the extent Columbia Township contends that its written policies governed the officers' conduct here, those policies were themselves constitutionally deficient because they failed to provide specific, operational safeguards concerning prolonged prone restraint, compression of the upper back, shoulder, or neck area, post-handcuff repositioning, recognition of respiratory distress, and mandatory emergency intervention after a restrained subject says he cannot breathe or exhibits obvious respiratory compromise.

17

116.    Although the written Use of Force policy generally referenced minimum force, de-escalation, and ground position, it failed to provide adequate specific direction sufficient to prevent the obvious danger of compressive or positional asphyxia in circumstances like those presented here.

117.    After the incident, Columbia Township and its policymakers had access to evidence bearing on the restraint, the officers' conduct, training records, camera failures, and Mr. Dawson's collapse.

118.    Despite that information, Columbia Township failed to undertake meaningful corrective action sufficient to prevent recurrence, thereby ratifying, condoning, or acquiescing in the unconstitutional conduct described herein.

119.    Columbia Township's ratification, condonation, and acquiescence further communicated to officers that unconstitutional uses of force and failures to timely respond to medical distress would not result in meaningful accountability.

120.    Columbia Township's policies, customs, practices, failures to train, failures to supervise, failures to equip, failures to enforce, and ratification were the moving force behind the constitutional violations inflicted on Mr. Dawson.

121.    As a direct and proximate result of Columbia Township's conduct, Mr. Dawson suffered severe physical pain, fear, terror, respiratory compromise, oxygen deprivation, the panic associated with the awareness of his inability to breathe, anoxic and/or hypoxic brain injury, cardiac arrest, and death.

## COUNT III

**WRONGFUL DEATH AND SURVIVAL ACTION — MCL §§ 600.2921 AND 600.2922 AGAINST ALL DEFENDANTS**

122. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

123. This Count is asserted as a damages and remedies count tied to the underlying wrongful acts, constitutional violations, neglect, fault, tortious conduct, and other actionable misconduct alleged above.

124. Under Michigan law, all actions and claims survive death, and actions for injuries resulting in death are prosecuted under Michigan's wrongful death statute.

125. Under Michigan law, every wrongful death action must be brought by, and in the name of, the personal representative of the estate of the deceased. Plaintiff Corey J. McCord brings this action in that capacity as Personal Representative of the Estate of Phillip L. Dawson, Jr., Deceased.

126. As set forth above, Defendants' wrongful acts, neglect, fault, excessive force, failure to intervene, deliberate indifference to serious medical needs, municipal policies, customs, practices, failures to train, failures to supervise, failures to equip, failures to enforce, and other tortious and unconstitutional conduct caused catastrophic injury to Mr. Dawson, resulting in his death.

127. Before his death, Mr. Dawson experienced conscious pain and suffering, fear, terror, physical distress, and the panic associated with the awareness of his inability to breathe.

128. By reason of the foregoing, Plaintiff, as Personal Representative, is entitled to recover all damages permitted under Michigan's survival and wrongful death statutes, including

but not limited to damages for conscious pain and suffering, medical, hospital, funeral, and burial expenses, and the losses sustained by the decedent's statutory beneficiaries to the extent proved and permitted by law.

129.   This Count does not create a separate underlying tort independent of the misconduct otherwise pleaded. Rather, it preserves and asserts the Estate's and statutory beneficiaries' right to recover the damages and remedies available under Michigan law for the underlying constitutional and tortious conduct that caused Mr. Dawson's death.

## COUNT IV

**GROSS NEGLIGENCE — IN THE ALTERNATIVE — MCL § 691.1407 AGAINST DEFENDANTS JACOB MILLS AND SPENCER BENNETT ONLY**

130.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

131.   This Count is pleaded in the alternative to the federal constitutional claims and to the extent a trier of fact determines that some or all of the conduct of Officer Mills and Officer Bennett is properly analyzed under Michigan tort law as gross negligence.

132.   At all relevant times, Defendants Jacob Mills and Spencer Bennett were employees, officers, and/or agents of a governmental agency acting within the course and scope of their duties.

133.   Under MCL 691.1407, a governmental employee is not immune from tort liability if his conduct amounts to gross negligence that is the proximate cause of the injury or damage, and the statute defines "gross negligence" as conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

134.    Officer Mills and Officer Bennett were grossly negligent, including but not limited to the following acts and omissions: (a) maintaining Mr. Dawson in a prone, handcuffed face-down restraint while he was in obvious distress; (b) continuing force and prone restraint after Mr. Dawson's resistance materially diminished or ceased; (c) failing to promptly reposition Mr. Dawson off his stomach despite obvious signs of respiratory compromise; (d) ignoring, minimizing, or failing to appropriately respond to Mr. Dawson's repeated pleas and statements of "I can't breathe"; (e) failing to timely recognize and respond to gurgling, snoring respirations, agonal breathing, limpness, cessation of meaningful movement, cyanosis, and lack of responsiveness; (f) failing to timely transition from force to rescue; (g) failing to timely initiate appropriate lifesaving measures; and (h) otherwise acting in a manner so reckless as to demonstrate a substantial lack of concern for whether serious injury or death would result.

135.    The risk of grave injury or death from maintaining a handcuffed person in a prone restraint while he cannot breathe and he is exhibiting obvious respiratory distress was known or obvious.

136.    Notwithstanding that known or obvious risk, Officer Mills and Officer Bennett acted with reckless disregard for Mr. Dawson's safety and bodily integrity.

137.    The grossly negligent conduct of Officer Mills and Officer Bennett was the proximate cause of Mr. Dawson's injuries, collapse, oxygen deprivation, catastrophic anoxic brain injury, cardiac arrest, and death.

138.    As a direct and proximate result of the gross negligence of Officer Mills and Officer Bennett, Mr. Dawson suffered conscious pain and suffering, physical injury, emotional

21

distress, medical injury, and death, and Plaintiff and the Estate suffered damages recoverable under Michigan law.

## RELIEF REQUESTED

A.      On Count I, Plaintiff requests compensatory damages against Officer Mills and Officer Bennett in an amount to be determined at trial for excessive force, failure to intervene, and deliberate indifference to serious medical needs;

B.      On Count II, Plaintiff requests compensatory damages against Defendant Columbia Township in an amount to be determined at trial for municipal liability under 42 U.S.C. § 1983;

C.      On Count III, Plaintiff requests all damages recoverable under Michigan's survival and wrongful death statutes, including but not limited to damages for conscious pain and suffering, physical injury, emotional distress, medical and hospital expenses, funeral and burial expenses, and damages sustained by the statutory beneficiaries to the extent proved and permitted by law;

D.      On Count IV, in the alternative, Plaintiff requests compensatory damages against Officer Mills and Officer Bennett for gross negligence under Michigan law;

E.      Plaintiff requests reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

F.      Plaintiff requests pre-judgment interest, post-judgment interest, and taxable costs as permitted by law; and

G.      Plaintiff requests such other and further relief as this Court deems just and proper.

23

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, pursuant to Fed. R. Civ. P. 38(a), demands a trial by jury — on all issues so triable — as provided by the Seventh Amendment to the United States Constitution.

Respectfully submitted,

Date:  April 14, 2026

<u>/s/ Bruce A. Inosencio, Jr.</u>
Bruce A. Inosencio, Jr., P54705
Kristina M. Fisk, P64634
Attorneys for Plaintiff
INOSENCIO & FISK, PLLC
740 W. Michigan Ave.
Jackson, MI 49201
(517) 796-1444
bruce@inosencio.com
kfisk@inosencio.com

23